UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Darren Jackson,

                                  Plaintiff,                          **21 Civ. 2415 (PED)**

              - *against* -                                           **DECISION AND
                                                                      ORDER**

Kilolo Kijakazi,[1]
*Acting Commissioner of the Social Security Administration*

                                  Defendant.

**PAUL E. DAVISON, U.S.M.J.:**

## I.  INTRODUCTION

Plaintiff Darren Jackson brings this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Acting Commissioner of the Social Security Administration that denied his application for Supplemental Security Income ("SSI").  [Dkt. 1.]  Plaintiff filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking to reverse the Acting Commissioner's decision that Plaintiff was not disabled within the meaning of the Social Security Act, 42 U.S.C. §§ 423 *et seq*. prior to December 4, 2018, and to remand the matter for further administrative proceedings.  [Plaintiff's Motion at Dkt. 20; Memorandum of Law at Dkt. 21; Reply in Support at Dkt. 25.]  The Acting Commissioner filed a cross-motion for judgment on the pleadings to affirm the decision and to dismiss this action.  [Defendant's Motion at Dkt. 23; Memorandum of Law at Dkt. 24.]  The parties consented to my jurisdiction on June 28, 2021.  [Dkt. 11.]  For the reasons that follow, Plaintiff's motion is **GRANTED**, and the Acting Commissioner's motion is **DENIED**.

---

[1] Kilolo Kijakazi became the Acting Commissioner on July 9, 2021.  She is substituted for the former Commissioner, Andrew Saul, Pursuant to Fed. R. Civ. P. 25(d).  No further action is required to continue this action.  42 U.S.C. § 405(g).

## II.   BACKGROUND

Plaintiff contends that he is disabled due to diabetes mellitus, obesity, post-traumatic stress disorder, and bipolar disorder.  [R. 567.][2]  Plaintiff alleges that the onset of his disability was March 22, 2012. [R. 564.]

### A.   Procedural History

On November 15, 2012, Plaintiff applied for SSI and any associated benefits. [Application at R. 169-76.]  Plaintiff's application was denied and he requested a hearing before an Administrative Law Judge ("ALJ").  [Denial at R. 65-76; Request for ALJ Hearing at R. 90-92.]  A hearing was held on February 10, 2015 before ALJ Kieran McCormack.  [R. 33.]  Plaintiff appeared with counsel and testified at the hearing.  [R. 37-53.]  On April 14, 2015, ALJ McCormack issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA") and denied Plaintiff's application.  [R. 16-26.]  ALJ McCormack's decision became the Acting Commissioner's final decision on October 11, 2016 when the Appeals Council denied Plaintiff's request for review.  [R. 1-6.]  Plaintiff then timely commenced an action in the United States District Court for the Eastern District of New York to appeal the Acting Commissioner's decision on November 7, 2016.  [R. 649-51.]  By decision dated December 27, 2019, the Eastern District of New York found that the ALJ's determination of Plaintiff's residual functioning capacity ("RFC") was not supported by

---

[2] Notations preceded by "R." refer to the certified administrative record of proceedings relating to this case submitted by the Commissioner in lieu of an answer.  [Dkt. 13.] The Court conducted a plenary review of the entire administrative record, familiarity with which is presumed.  In light of plaintiff's narrow challenge to the ALJ's decision, I assume knowledge of the facts surrounding plaintiff's medical treatment and do not recite them in detail, except as germane to the analysis set forth below.

the medical evidence.  [R. 677-85.]  Accordingly, the district court remanded Plaintiff's

application to the SSA for further proceedings.  [R. 684-85.]  Plaintiff was allowed to update the

record and on August 12, 2020, Plaintiff had another hearing, this time telephonically and before

ALJ Sandra McKenna.  [R. 590, 689.]  Plaintiff appeared with counsel and testified at the

hearing.  [R. 598-613.]  Vocational expert Helen Feldman also provided testimony at the

hearing.  [R. 613-19.]  By decision dated December 1, 2020, ALJ McKenna found that Plaintiff

had been disabled since December 4, 2018, but had not been disabled prior to December 4, 2018.

[R. 576-77.]  Plaintiff timely commenced this action on March 19, 2021.  [Dkt. 1.]

**B.**     **The Medical Evidence**

     **1.**     **Medical Evidence from 2012 to December 4, 2018**

In and around March 23, 2012, Plaintiff had an admission screening at the Downstate

Correctional Facility.  [R. 403.]  In the screening, it was noted that Plaintiff "was receiving

mental health services while incarcerated with diagnoses of Paranoid Schizophrenia and

Antisocial Personality Disorder."  [*Id.*]  It was further noted that Plaintiff had a medication order

for Zoloft, Risperidone, and Benadryl.  [Id.]  Plaintiff denied "experiencing psychiatric

symptoms to include depression, anxiety, mania or psychosis" and further described his mood as

"good[.]"  [*Id.*]  Plaintiff also denied "suicidal or homicidal ideation, plan or intent, and reports

he is future oriented for his children."  [*Id.*]  Plaintiff reported a history of inpatient psychiatric

hospitalization in 1988, 1990, 1994, and 1999 for "a period of six months for each admission."

[*Id.*]  He also reported that he had a history of depression and psychosis.  [R. 404.]  He reported

that he began hearing voices when he was approximately 15 or 16.  [*Id.*]  He further reported that

he had a history of suicidal ideation, including a suicide attempt by jumping off of a bridge.  [*Id.*]

With respect to Plaintiff's mental status, the screening noted that Plaintiff's speech was poorly articulated but spontaneous, goal-directed and of normal rate, rhythm, and volume.  [*Id.*]  Plaintiff's mood was neutral and described as "good", his affect was within normal range and congruent to his mood, and his insight and judgement were fair.  [*Id.*]  Plaintiff's psychotic symptoms were described to not include hallucinations, delusions, obsessions, phobias, or over-valued ideas, and perceptual disturbances of any kind were denied.  [R. 404-05.]  Other observations noted that there was no evidence of psychomotor disturbances, Plaintiff maintained behavioral control, he appropriately maintained eye contact, and his approach was attentive, cooperative, and congenial.  [R. 405.]

On March 28, 2012, Ireneo M. Espiritu, M.D. conducted an initial psychiatric evaluation of Plaintiff at the Central New York Psychiatric Center. [R. 393-94.] Dr. Espiritu noted that Plaintiff's medical issues included diabetes, hypertension,[3] and neuropathy.  [R. 393.]  In a medical status examination, Dr. Espiritu further noted that Plaintiff was "calm and cooperative" and that his speech was "coherent[.]"  [*Id.*]  He also observed that Plaintiff's mood was "neutral at this time" and that there were "[n]o mood changes[.]"  [*Id*.]  Under impression/diagnoses, Dr. Espiritu stated that Plaintiff had a mood disorder not otherwise specified,[4]  antisocial personality

_____

[3] Dr. Espiritu noted that Plaintiff had "HTN" which is the medical abbreviation for hypertension. *See Appendix B: Some Common Abbreviations*, MedlinePlus, medlineplus.gov/appendixb.html (last visited on June 1, 2022).

[4] Dr. Espiritu noted that Plaintiff had a "mood D/O NOS" which is the medical abbreviation for a mood disorder not otherwise specified. *See Practical Guide to Clinical Medicine*, UC San Diego School of Medicine, meded.ucsd.edu/clinicalmed/abbreviation.html (last visited June 1, 2022).

disorder,[5] diabetes, hypertension, and neuropathy.  [R. 394.]

On March 30, 2012, Plaintiff met with Julie Yagoda, Psychology Assistant.  [R. 409.]
Ms. Yagoda noted that Plaintiff was making good progress in his treatment, and that he denied
suicidal ideation.  [R. 408.]  Ms. Yagoda observed that Plaintiff's mood was neutral, his affect
was within normal range and congruent to his mood, and his judgment and insight were good.
[Id.]  Ms. Yagoda noted that Plaintiff maintained behavioral control throughout the interview, he
appropriately maintained eye contact, and he did not have hallucinations, delusions, obsessions,
phobias, or over-valued ideas.  [Id.]  Ms. Yagoda further noted that perpetual disturbances of any
kind were denied.  [Id.]

On April 16, 2012, Plaintiff met with Dr. Espiritu.  [R. 395.]  Dr. Espiritu reiterated
Plaintiff's diagnoses of mood disorder and antisocial personality disorder.  [Id.]  Dr. Espiritu
observed that Plaintiff was calm and cooperative with a neutral mood and no psychosis.  [Id.]
Dr. Espiritu made similar observations on May 7, 2012.  [R. 397.]  On June 1, 2012, a registered
nurse conducted a health screening of Plaintiff.  [R. 352.]  The health screening indicated that
Plaintiff was taking medications for physical problems in addition to his mental health
medications.  [Id.]  Plaintiff further indicated that he had vision problems.  [Id.]

On June 7, 2012, Plaintiff's midstate mental health file was updated.  [R. 322.]  The
update provides that Plaintiff reported that he was adjusting well to his new environment.  [Id.]
Also on June 7, 2012, A. Tanner, LCSW/SWII completed a primary therapist progress note

---

[5] Dr. Espiritu noted that Plaintiff had "ASPD" which is the medical abbreviation for
antisocial personality disorder. *See* Mark Zimmerman, *Antisocial Personality Disorder (ASPD)*,
Merck Manual Professional Version, merkmanuals.com/professional/psychiatric-
disorders/personality-disorders/antisocial-personality-disorder-aspd (last modified on May
2021).

concerning Plaintiff.  [R. 416.]  Tanner observed that Plaintiff "engaged in spontaneous verbal conversation" and "was very animated with faces and hand gestures to express emotions."  [*Id.*]  During their meeting, Tanner noted that Plaintiff stated that he had been receiving SSI for ten years "for staring into space sometimes, not being able to focus sometimes and manic depression."  [*Id.*]  When Tanner redirected the conversation to the present, Tanner observed that Plaintiff "was superficially cooperative after redirection and no longer animated."  [*Id.*]  Tanner also noted that Plaintiff reported that he was taking Zoloft, Risperdal, and Benadryl, as well as Glupizode and Metformin.  [*Id.*]  With respect to Plaintiff's affect, Tanner noted that Plaintiff was not irritable or agitated and expressed "[n]o overt symptoms of anxiety or depression."  [R. 417.]  Tanner did not observe psychosis and did not observe "delusional content or internal preoccupation[.]"  [*Id.*]  Tanner made similar observations regarding Plaintiff's affect and psychosis in follow-up appointments on July 5, 2012, August 2, 2012, August 30, 2012, and September 27, 2012.  [R. 418, 420, 422, 424.]

On July 16, 2012, Plaintiff had another initial psychiatric evaluation. [R. 399.][6]  In the impression/diagnoses section of the evaluation, the individual conducting the evaluation noted that Plaintiff had antisocial personality disorder, diabetes mellitus,[7]  hypertension, and

---

[6] Plaintiff's previous psychiatric evaluations had been with Dr. Espiritu, but it appears that this psychiatric evaluation was conducted by another individual whose name is illegible.

[7] The individual evaluating Plaintiff observed that Plaintiff had "DM" which is the medical abbreviation for diabetes mellitus. *See* Erika F. Brutsaert, *Diabetes Mellitus (DM)*, Merck Manual Consumer Version, merkmanuals.com/home/hormonal-and-metabolic-disorders/diabetes-mellitus-dm-and-disorders-of-blood-sugar-metabolism/diabetes-mellitus-dm (last modified on September 2020).

neuropathy, and that they were ruling out whether Plaintiff had post-traumatic stress disorder.[8]
[R. 400.]

On July 17, 2012, Plaintiff had an appointment regarding his physical health.  [R. 363.]

It was observed that Plaintiff's diabetes mellitus was under "good control" and that Plaintiff had

large calluses on the plantar aspect of his feet.  [*Id.*]  Plaintiff reported foot pain as a result of

these calluses.  [*Id.*]  On August 8, 2012, Plaintiff had an appointment with Subbarao Ramineni,

M.D.  [R. 377.]  Dr. Ramineni observed that Plaintiff was a diabetic and had an appointment to

trim painful plantar callouses and thickened mycotic toenails.  [*Id.*]  Dr. Ramineni noted that he

was unable to trim either and that Plaintiff received "[n]o relief with soaking or green scrubbie."

[*Id.*]  Plaintiff reported further foot pain from his boots on August 11, 2012.  [R. 360.]

On October 22, 2012, Plaintiff met with a new therapist, A. Sowhich, SWII.  [R. 426.]  In

the primary therapist progress note, Sowhich observed that Plaintiff's mood was neutral and that

he had a congruent affect.  [*Id.*]  Sowhich further noted that Plaintiff "reported auditory

hallucinations but did not appear internally preoccupied[.]"  [*Id.*]

On November 1, 2012, Plaintiff had a meeting with Debra Mennig, SWII regarding

Plaintiff's discharge planning.  [R. 427.]  Ms. Mennig noted that records from Kings County

Hospital confirmed that Plaintiff had been hospitalized in 1996, 1997, twice in 1998, 1999, 2001,

and 2003.  [*Id.*]  Ms. Mennig observed that Plaintiff's mood was "alright" and his affect was

congruent to his mood.  [*Id.*]  She further observed that Plaintiff denied any psychotic symptoms

and that he did not appear to be responding to internal stimuli.  [*Id.*]  She also noted that Plaintiff

---

[8] The individual evaluating Plaintiff observed that Plaintiff had "R/O PTSD".  [R. 400.]
"R/O" is the medical abbreviation of "rule out" and "PTSD" is the medical abbreviation for post-
traumatic stress disorder.  *See Practical Guide to Clinical Medicine*, *supra* note 4.

was cooperative and that he "laughed and smiled" especially when she "told him his voice sounded similar to a television personality." [*Id.*]

On November 8, 2012, Plaintiff had a psychiatric progress appointment with psychiatrist Dr. Jean Liu. [R. 401.]  Dr. Liu observed that Plaintiff was "tearful at times" but had "no active psychosis." [*Id.*]  Dr. Liu also noted that Plaintiff's medications included Zyprexa. [R. 402.]  On November 13, 2012, Plaintiff had an appointment concerning his physical health, and reported that he had painful calluses on his feet.  [R. 358.]  The health record from that appointment indicates that Plaintiff was a known diabetic. [*Id.*]  The provider ordered that Plaintiff use callous pads, and explained diabetic foot care. [*Id.*]

On November 15, 2012, Plaintiff had another session with Ms. Mennig.  [R. 429.]  Ms. Mennig stated that Plaintiff had reported that "his medications were recently changed, as he was experiencing auditory hallucinations again."  [*Id.*]  Ms. Mennig stated that Plaintiff's mood was even and that his affect was congruent to his mood.  [*Id.*]  With respect to Plaintiff's psychotic symptoms, Plaintiff denied having them and Ms. Mennig observed that Plaintiff did "not appear to be responding to internal stimuli."  [*Id.*]

On November 16, 2012, Ms. Mennig and Dr. Liu executed Plaintiff's discharge summary. [R. 436.]  Plaintiff later executed this summary on January 24, 2013.  [R. 329.]  The summary noted that Plaintiff's diagnosis included a mood disorder not otherwise specified, antisocial personality order, and diabetes type II.  [R. 433.]  The summary further noted that Plaintiff's medications were Zoloft and Zyprexa.  [R. 433.]  In the section regarding Substance Abuse, the summary notes that Plaintiff used cocaine daily from 1978 to 2004 and that he completed an inpatient substance abuse treatment program in 2000.  [R. 434.]  For Plaintiff's

course of treatment, the summary provides that Plaintiff "has been cooperative while in treatment.  One must take into consideration that he is currently in a controlled environment where he is monitored, provided with reminders, etc." [R. 435.]  For Plaintiff's speech, thought, and perception, the summary notes that Plaintiff's speech is normal, his thoughts are organized, and although he reports hearing voices even while medicated, he was not presently responding to any internal stimuli.  [*Id.*]  With respect to Plaintiff's intellectual functions, the summary noted that Plaintiff reported difficulty concentrating and staying focused at times and that he had "difficulty following moderately complicated instructions." [R. 436.]  With respect to Plaintiff's current functional assessment, the summary notes that Plaintiff "will need continued mental health treatment in the community." [R. 436.]  The summary also noted that "[c]ontinued support and structure will be very important when [Plaintiff] returns to the less restrictive community setting." [*Id.*]  The summary continued, that Plaintiff's "psychiatric symptoms prevent the work related mental activities needed to sustain competitive employment.  The [Plaintiff's] mental health condition impacts his ability to understand instructions, retain information, stay focused for any length of time, and maintain regular, sustained, gainful employment." [*Id.*]  This section of the summary concluded that Plaintiff's "psychiatric symptoms severely limit his functioning and have impacted his ability to hold any kind of competitive employment, necessitating SSI entitlements." [*Id.*]

On November 29, 2012 Plaintiff had an appointment and complained that he had painful calluses on his feet. [R. 357.]  The provider ordered Plaintiff to use callous pads. [*Id.*]  Later, on December 5, 2012, Plaintiff had a consultation with Dr. Ramineni for his graphite toe nails and thick calluses. [R.375.]  Dr. Ramineni noted that Plaintiff did not have new diabetic boots or

insoles that had been recommended.  [*Id.*]  In and around January 4, 2013, Plaintiff had an

appointment regarding his physical health in which the provider noted that Plaintiff reported

hearing voices.  [R. 358.]

On February 27, 2013, Christopher Flach, Ph. D., a consultative examiner, conducted a

psychiatric evaluation of Plaintiff.  [R. 343.]  Dr. Flach noted that Plaintiff had "[d]epressive

symptoms" but "[n]o suicidal or homicidal thinking."  [R. 343.]  He further noted that

"[p]ost-traumatic stress disorder was suggested."  [*Id.*]  For Plaintiff's mental status examination,

Dr. Flach stated that Plaintiff "was generally seen as a cooperative individual who presented

with fair social skills."  [R. 344.]  Dr. Flach further stated that Plaintiff did not have any

prosthetic devices, but that Plaintiff said he had glasses.  [*Id.*]  Dr. Flach also observed that

Plaintiff did not have a walker, a cane, or a wheelchair.  [*Id.*]  Dr. Flach noted that Plaintiff's

attention and concentration, as well as his recent and remote memory skills, were "mildly

impaired" and his cognitive functioning was below average.  [R. 345.]  Dr. Flach observed that

Plaintiff seemed "sort of isolated" and that his family relationships were limited to his brother.

[*Id.*]  For his medical source statement, Dr. Flach stated that:

> [Plaintiff] is able to follow and understand simple directions and instructions. He
> is performing simple tasks independently. He has mild problems maintaining
> attention and concentration. He is able to maintain a regular schedule, learn new
> tasks. He is able to perform some complex tasks but needs some support, and
> encouragement. He is making some appropriate decisions, has some difficulty
> though relating to others and dealing with stress. The results of the examination
> do appear consistent with psychiatric problems with [sic] seem as though they
> would interfere with the [Plaintiff's] ability to function on a daily basis.

[*Id.*]  Dr. Flach diagnosed Plaintiff with bipolar disorder not otherwise specified with psychotic

features, panic disorder with some agoraphobia, rule out post-traumatic stress disorder, and

diabetes.  [R. 346.]

On the same day, February 27, 2013, Plaintiff also had an internal medicine examination with Vinod Thukral, M.D.  [R. 349.]  For activities of daily living, Dr. Thukral stated that Plaintiff reported that he could not do the cooking, the cleaning, the laundry, or the shopping because of his history of depression and post-traumatic stress disorder.  [*Id.*]  Dr. Thukral further stated that Plaintiff's uncorrected vision was 20/30 in his right eye and 20/200 in his left eye, and that for both eyes, Plaintiff was 20/25.  [*Id.*]  For Plaintiff's general appearance, Dr. Thukral observed that Plaintiff "appeared to be in no acute distress" and had a normal gait.  [*Id.*]  He further observed that Plaintiff could walk on heels and toes without difficulty, he could squat in full, his stance was normal, he did not use assistive devices, and he did not need help changing for the exam.  [*Id.*]  Dr. Thurkal also noted that Plaintiff had a full range of motion, 5/5 strength in his upper and lower extremities, and 5/5 bilateral grip strength.  [R. 350.]  For his medical source statement, Dr. Thukral noted that Plaintiff had "no limitations for sitting, standing, bending, pushing, pulling, lifting, carrying, or any other such related activities."  [R. 351.]  Dr. Thukral did note, however, that Plaintiff had "moderate limitations for activities requiring fine visual acuity due to severe decreased visual acuity in the left eye as depicted above."  [*Id.*]

In and around March 6, 2013, Eddy Cadet, M.D. conducted an intake of Plaintiff for FEGS purposes.  [R. 281.]  For current signs/symptoms, Dr. Cadet observed that Plaintiff "feels depressed" and was "always sad" and had "no motivation to do anything."  [*Id.*]  For hallucinations, delusions, or other bizarre behavior exhibited, Dr. Cadet noted that Plaintiff was "whispering[.]"  [R. 281-82.]  With respect to Plaintiff's work limitations, Dr. Cadet noted that Plaintiff did not have any lifting limitations, standing limitations, walking limitations, sitting limitations, or squatting limitations.  [R. 289-90.]  Dr. Cadet also noted that Plaintiff's diabetes

11

mellitus was stable. [R. 293.]

The next day, on March 7, 2013, Plaintiff had a meeting with Thomas Kranjac, M.D. [R. 307.] Dr. Kranjac noted that Plaintiff had depressed feelings, difficulty falling asleep, racing thoughts at night, difficulty concentrating, and crying. [*Id.*] Dr. Kranjac also noted that Plaintiff had auditory hallucinations of whispered voices, but no visual hallucinations. [*Id.*] Dr. Kranjac stated that Plaintiff had no homicidal or suicidal ideation, but that Plaintiff had panic attacks with agoraphobia and mood swings with rapid speech and racing thoughts. [R. 302-03.] In terms of Plaintiff's appearance, Dr. Kranjac observed that Plaintiff was cooperative, articulate, intelligent, and Plaintiff made good eye contact. [R. 303.] Dr. Kranjac further noted that Plaintiff had difficulty focusing and concentrating. [R. 304.] For work accommodations, Dr. Kranjac stated that Plaintiff would need a lower stress environment, one-on-one communications, and non-rush hour travel accommodations. [R. 306.] As part of this meeting with Dr. Kranjac, case manager Kerron Prendergast performed a recommended functional capacity outcome for Plaintiff on March 25, 2013. [R. 308.] For recommended functional capacity outcome, Prendergast stated that Plaintiff had incompletely treated or untreated chronic mood disorder, bipolar disorder, schizo-affective disorder not otherwise specified, panic disorder with agoraphobia, rule out chronic post-traumatic stress disorder with flashbacks, cocaine dependency in the long term that was in remission, and rule out personality disorder not otherwise specific. [R. 308.]

On March 8, 2013, Dr. J. Echevarria conducted a review of Plaintiff's record up until that day. [R. 69.] Based on his review, Dr. Echevarria concluded that the restriction on Plaintiff's activities of daily living was mild, Plaintiff's difficulties in maintaining social function were moderate, Plaintiff's difficulties in maintaining concentration, persistence or pace were

moderate, and Plaintiff had one or two repeated episodes of decompensation. [*Id.*]  Dr.

Echevarria concluded that Plaintiff's "ability to deal with co-workers and the public would be

somewhat reduced, but adequate to handle brief and superficial contact.  Similarly, his ability to

tolerate and respond appropriately to supervision would be reduced, but adequate to handle

ordinary levels of supervision in the customary work setting." [*Id.*]  Dr. Echevarria observed

that Plaintiff's field of vision would be limited in his left eye based on Dr. Thukral's testing.

[*Id.*]  Dr. Echevarria further noted that Plaintiff would be moderately limited in his ability to

carry out very short and simple instructions, his ability to carry out detailed instructions, his

ability to maintain attention and concentration for extended periods, his ability to sustain an

ordinary routine without special supervision, his ability to work  in coordination with or in

proximity to others, and his ability to complete a normal workday or workweek without

interruptions from psychologically based symptoms.  [R. 72-73.]  Dr. Echevarria also noted that

Plaintiff would be moderately limited in his ability to interact appropriately with the general

public, his ability to accept instruction and respond appropriately to criticism from supervisors,

and his ability to get along with coworkers or peers without distracting them.  [R. 73.]

According to Dr. Echevarria, Plaintiff would also be moderately limited in his ability to respond

appropriately to changes in the work setting.  [*Id.*]

On March 15, 2013, Pendergast completed a function report for Plaintiff.  [R. 208.]

Pendergast noted that Plaintiff lived alone in a shelter.  [*Id.*]  Pendergast further stated that

Plaintiff woke up with great difficulty due to his bipolar disorder, manic depressive disorder, and

panic disorder.  [*Id.*]  Pendergast further noted that Plaintiff would leave to attend doctor

appointments, but would "stay inside for fear of being around people because of his panic

attacks." [*Id.*]  Pendergast also noted that Plaintiff was unable to work because he "experienced mood swings as a result of his bipolar disorder, anxiety, depression, aches/pains, mania because of his manic depression and fear of crowds, shaking, convulsions and sweats due to his panic attacks." [*Id.*]  Pendergast further stated that Plaintiff would not go outside due to his fear of crowds, and that he suffered from "shaking, sweats, fear of being attacked, [and] fear of places where it was difficult to escape because of his panic attacks." [R. 211.]  With respect to Plaintiff's abilities, Pendergast stated that Plaintiff could not remain still and would forget information. [R. 213.]  Pendergast further stated that Plaintiff would have difficulty following instructions and concentrating on things for a long time. [*Id.*]  Pendergast also stated that Plaintiff experiences frequent memory loss and issues remembering and that he would not get along with others due to his panic attacks. [*Id.*]  Finally, Pendergast remarked that Plaintiff experienced "fatigue, lack of energy and loss of interest due to his Bipolar disorder, Manic depressive Disorder and panic disorder, causing him to not be able to perform activities of daily living such as washing dishing [sic], problems bathing, issues with grooming, mowing the lawn, sweeping, household repairs and mopping." [R. 215.]

On March 26, 2013, Plaintiff went to Kings County Hospital Center and reported symptoms of sadness, irritability, and sleep disturbances. [R. 545.]  The provider also noted that Plaintiff was somewhat unkempt. [R. 546.]  On May 24, 2013, Plaintiff went to Kings County Hospital Center for a psychological assessment. [R. 526.]  According to the assessment, Plaintiff reported depressed feelings, anxiety with panic attacks where he breaks out in sweat, mood changes, and disorganized thoughts. [*Id.*]  Plaintiff also noted his history of auditory hallucinations in the form of whispers but did not provide further details about his hallucinations.

[*Id.*]  On October 18, 2013 the Department of Psychiatry at Kings County Hospital Center discharged Plaintiff for failing to respond to outreach.  [R. 511.]

On January 15, 2014, Plaintiff returned to Kings County Hospital Center for another psychological assessment.  [R. 515.]  In Part I of the assessment, Plaintiff reported that he was receiving psychological treatment and medication management through the shelter.  [*Id.*]  Plaintiff further reported that he has a past of bipolar disorder and post-traumatic stress disorder.  [*Id.*]  He also noted that Plaintiff had been experiencing a depressive mood and mood swings, as well as flashbacks, nightmares, and sleeplessness.  [*Id.*]  In Part II of the assessment, which was conducted on February 2, 2014, Therapist Daniel Jones noted that Plaintiff reported experiencing flashbacks of the trauma from the sexual abuse he suffered at the hands of his now-deceased older brother.  [R. 521.]  Plaintiff stated that he was re-traumatized when he witnessed sexual violence while incarcerated.  [R. 525.]  Therapist Jones further noted that Plaintiff reported manic and depressive symptoms.  [R. 523.]

On March 20, 2014, Plaintiff had an appointment with Kevin Lapin, N.P. at the Sunrise Medical Group.  [R. 501.]  Nurse Lapin referred Plaintiff for retinopathy evaluation and noted that further adjustments would need to be made to improve Plaintiff's glycemic control.  [*Id.*]

On September 2, 2014, Monica Broderick, M.D. provided a medical source statement that addressed Plaintiff's abilities despite his mental impairments. [R. 466.]  Dr. Broderick noted that Plaintiff was diagnosed with bipolar, anti-social traits, and diabetes mellitus II. [*Id.*] Dr. Broderick identified Plaintiff's symptoms as sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, substance dependence, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, suicidal ideation or attempts, blunt or

15

inappropriate affect, decreased energy, manic syndrome, intrusive recollections of a traumatic experience, and hostility and irritability.  [*Id.*]  Dr. Broderick also listed Plaintiff's prescribed medications as Divalproex, Fluphenazine, and Hydroxyzine, and noted that these medications could cause severe drowsiness, difficulty concentrating, and fatigue.  [R. 467.]  Dr. Broderick further noted that Plaintiff would need to be absent from work about twice a month.  [*Id.*]  Dr. Broderick also indicated that Plaintiff would have certain limitations due to his impairment.  [R. 468.]  Dr. Broderick noted that Plaintiff would have an extreme loss in accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes.  [R. 469.]  Dr. Broderick also noted that Plaintiff had a marked loss in maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, dealing with the stress of semi-skilled and skilled work, working in coordination or proximity to others without being unduly distracted, completing a normal workday or workweek without interruptions from psychologically based symptoms, interacting appropriately with the public, responding appropriately to changes in a routine work setting, and setting realistic goals or making plans independently of others.  [R. 468-69.]  Dr. Broderick further noted that Plaintiff had moderate loss in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining regular attendance and punctuality, making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions or requesting assistance, maintaining socially appropriate behavior, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, and using public transportation.  [*Id.*]  Dr. Broderick further stated that Plaintiff would have

marked difficulties in maintaining social functioning, and would have frequent deficiencies of concentration, persistent. or pace resulting in failure to complete tasks in a timely manner, and repeated episodes of deterioration of decomposition in work or work-like settings.  [R. 469-70.]

On September 7, 2014, Nurse Lapin conducted a medical source statement about what Plaintiff can still do despite his impairments.  [R. 472.]  Nurse Lapin noted that Plaintiff's diagnoses were diabetes and bipolar disorder or psychiatric issues.  [*Id.*]  Nurse Lapin stated that Plaintiff's symptoms included dizziness in the morning, slow change of position (rising), and that Plaintiff had low back pain with lifting.  [*Id.*]  Nurse Lapin noted that Plaintiff's pain was never severe enough to interfere with his attention and concentration.  [*Id.*]  Nurse Lapin further stated that Plaintiff could sit continuously for an hour before he would need to walk about, and that Plaintiff could only stand or walk for 15 minutes before he would need to sit down again. [R. 472-73.]  Nurse Lapin also opined that the total cumulative sitting time Plaintiff would need during a work day would be five hours, and that the total cumulative time Plaintiff could spend standing or walking about during a work day would be five hours.  [R. 473-74.]  Nurse Lapin further noted that Plaintiff would need to rest, but that a morning break, a lunch period, and an afternoon break scheduled at approximately two-hour intervals would be sufficient.  [R. 475.]  In terms of lifting and carrying, Nurse Lapin noted that Plaintiff could carry one to five pounds constantly, and six to ten pounds occasionally, but could never lift more than eleven pounds.  [R. 476.]  Nurse Lapin also stated that Plaintiff did not need any assistive device to aid him in walking or standing.  [R. 477.]

On December 31, 2014, Therapist Jones entered a social work note regarding a meeting he had with Plaintiff.  [R. 557.]  Therapist Jones stated that the day prior Plaintiff informed

Therapist Jones that he needed to cancel his upcoming appointment, but that Plaintiff indicated that he would try to improve keeping the schedule.  [*Id.*]  On January 30, 2015, Dr. Broderick entered a note concerning Plaintiff.  [R. 933.]  She noted that she was scheduled to see Plaintiff that day, but Plaintiff had left an appointment with Therapist Jones and headed straight home before seeing her.  [*Id.*]  She rescheduled the appointment for February 2, 2015.  [*Id.*]  Later, on February 27, 2015, Therapist Jones entered a note that he had reached out to Plaintiff to reschedule his appointment to March 4, 2015.  [*Id.*]

On February 9, 2015, Jedidiah Burack, M.D. wrote a letter indicating that Plaintiff had been his patient for the past 10 years and that Plaintiff's medication and problems had been well documented over the years with Dr. Burack.  [R. 493.]

On March 6, 2015, Plaintiff had an appointment with Tahir Khan, M.D.  [R. 935.]  Dr. Khan noted that Plaintiff reported "intermittent depressed/anxious mood" and that he had an auditory hallucination most recently last year.  [*Id.*]  Dr. Khan noted that Plaintiff also reported some increase in anxiety symptoms in interval with resultant distress but no over dysfunction. [*Id.*]  Dr. Khan observed that Plaintiff was disheveled in his appearance, that he had a neutral appearing mood, that his speech was within normal limits, and that he had a constricted affect. [*Id.*]  Dr. Khan further observed that Plaintiff had a linear thought process, and no overt delusions were elicited.  [*Id.*]  Dr. Khan renewed Plaintiff's prescriptions.  [R. 936.]

On March 24, 2015, Therapist Jones entered a note indicating that Plaintiff did not attend his appointment that day.  [R. 938.]  On April 16, 2015, Therapist Jones noted that Plaintiff showed up that day but had an appointment for the previous day.  [R. 939.]  On April 21, 2015, Plaintiff had an appointment with Therapist Jones, and Therapist Jones noted that Plaintiff was

alert and oriented, his affect was full range, his mood was "OK", and his speech was normal.  [R. 940.]  Therapist Jones also noted that he discussed Plaintiff's attendance and punctuality issues with him and encouraged Plaintiff to arrive early or on time.  [*Id.*]  Nonetheless, Plaintiff missed his appointments on May 19, 2015, May 28, 2015, and July 13, 2015.  [R. 941, 942, 954.]  On June 1, 2015, Plaintiff was able to attend an appointment with Therapist Jones.  [R. 951.]  Therapist Jones noted that Plaintiff was alert and oriented, his affect was in full range, his speech was normal, but his mood was "down."  [*Id.*]

On August 12, 2015, Therapist Jones completed a discharge summary for Plaintiff because in spite of his outreach, 30 days had passed since the initial missed session.  [R. 956.]  In the summary, with respect to the history of Plaintiff's present illness, Therapist Jones noted that Plaintiff's "chief reported symptoms include both depressive and manic presentations (depressed mood, decreased energy levels, loss of interest in favored activities, racing thoughts, suicidal ideations, and pressured speech)."  [*Id.*]  Therapist Jones further notes that Plaintiff had multiple psychiatric hospitalizations and extensive mental health and outpatient substance abuse treatment.  [*Id.*]  Therapist Jones noted that Plaintiff's progress was limited when he missed sessions and did not take his medication.  [R. 957.]  He further noted that Plaintiff often missed session and consistently required outreach to keep engaged in his care.  [*Id.*]  Therapist Jones also noted that Plaintiff had showed some progress with symptom improvement, but that "his limited attendance and medication adherence stymied greater progress."  [*Id.*]

On November, 10, 2015, Plaintiff went to Kings County Hospital Center to refill his medication.  [R. 959.]  During his visit, Plaintiff denied having hallucinations, paranoia, or a depressed mood.  [*Id.*]  On September 7, 2016, Plaintiff again returned to Kings County Hospital

Center to refill his medication.  [R. 979.]  Plaintiff denied suicidal ideation and previous

attempts, and denied homicidal ideation.  [*Id.*]  Plaintiff also denied auditory and visual

hallucinations, and a history of physical and sexual abuse.  [*Id.*]

On October 4, 2016, Plaintiff returned to Kings County Hospital Center for a walk-in

psychiatric screening.  [R. 998.]  Plaintiff met with Tom Asfar, M.D.  [*Id.*]  Plaintiff reported

feeling "anxious, depressed, irritable mood, decreased sleep, racing thoughts, agitation, loss of

concentration, flashbacks to past rape and assault by brother at age 8."  [*Id.*]  Plaintiff also

reported his last suicide attempt 20 years ago when he jumped off a bridge in response to voices.

[*Id.*]  Dr. Asfar observed that Plaintiff appeared overweight and friendly, his mood was stressed

and anxious, and his affect was constricted.  [*Id.*]  Dr. Asfar further noted that Plaintiff's reported

his current symptoms as depression, and anxiety, particularly around crowds of people on public

transportation.  [R.1000.]  Also included in Plaintiff's reported current symptoms was auditory

hallucinations and that he was hearing voices whispering to him during the night and when he

was alone.  [*Id.*]  Dr. Asfar noted that Plaintiff's recent activating events included a major

depressive episode, agitation, previous psychiatric diagnosis, chronic physical pain,

non-compliance with treatment, not receiving treatment, supportive social network or family,

and disorganized thought process/behaviors.  [R. 1003-04.]  Plaintiff also met with Elise Gadson,

LMSW for a screening assessment.  [R. 1007.]  Ms. Gadson noted that Plaintiff reported

depression, anxiety especially in crowds of people on public transportation, impatience, and

auditory hallucinations.  [*Id.*]  Plaintiff denied suicidal and homicidal ideations, intention, and

plan. [*Id.*]

On October 19, 2016, Plaintiff had an appointment with Teresa Yodice, LCSW.  [R.

1009.]  Ms. Yodice noted that Plaintiff presented with a depressed and anxious mood, his affect was congruent with his mood, his speech was normal, he was alert, and he had a logical thought process.  [*Id.*]  Ms. Yodice noted that Plaintiff reported that he had two suicide attempts, chronic auditory hallucinations, severe depression, and approximately ten hospitalizations throughout his life.  [R. 1010.]  Ms. Yodice further noted that Plaintiff reported auditory hallucinations, "such as an ongoing 'irritating whisper[.]'"  [R. 1011.]  Plaintiff also reported that his symptoms included "labile moods, moods cycling between euphoria and depression, crying constantly, disordered sleep, disordered eating, sadness, lack of motivation, lack of focus, and frustration intolerance especially with crowds and waiting time."  [*Id.*]  Ms. Yodice noted that Plaintiff reported symptoms of post-traumatic stress disorder relating to being raped by his brother.  [*Id.*]

In November 2016, Plaintiff again had issues attending his appointments.  He missed appointments on November 2, 2016, and November 3, 2016.  [R. 1012.]  On November 17, 2016, Plaintiff had an appointment with Jennifer Hunter, LCSW.  [R. 1013.]  Ms. Hunter reported that Plaintiff was alert and oriented, he was appropriately attired and groomed, and his speech was within normal range.  [*Id.*]  Ms. Hunter noted that Plaintiff denied suicidal and homicidal ideations, but had a history of suicidal attempts.  [*Id.*]  Plaintiff then cancelled his appointment on November 22, 2016 and missed his appointment on November 25, 2016.  [R. 1014.]

On December 6, 2016, Plaintiff arrived without an appointment, but was nonetheless seen by Ms. Hunter.  [R. 1015.]  Ms. Hunter noted that Plaintiff was alert and oriented, he was appropriately attired and groomed, and his speech was within normal range.  [*Id.*]  Plaintiff's primary reason for the appointment was to locate a program for him to engage in or else be

21

returned to jail.  [*Id.*]  Plaintiff then missed an appointment on December 12, 2016.  [R. 1016.]

Plaintiff managed to make his rescheduled appointment on December 20, 2016.  [R. 1017.]  Ms.

Hunter noted that Plaintiff was alert and oriented, his attire and grooming were within normal

range, and his speech was within normal range.  [*Id.*]  Ms. Hunter noted that Plaintiff's mood

was initially somber but gradually became jovial.  [*Id.*]  She also noted that Plaintiff became

tearful twice during the appointment; first when discussing his contact with his son, and second

when discussing the negative impact that his past life on the streets had on his family. [*Id.*]

On January 11, 2017, Ms. Hunter informed Plaintiff that due to his missed appointments,

she would need to close his case unless she heard from him.  [R. 1018.]  On January 13, 2017,

Plaintiff had and appointment with Jean Bien-Aime, M.D.  [R. 1020.]  Dr. Bien-Aime noted that

Plaintiff reported that he had been feeling angry, that he had been crying sometimes, and that he

could not focus his mind.  [*Id.*]  Plaintiff also reported flashbacks and complained of difficulty

sleeping.  [*Id.*]  Dr. Bien-Aime observed that Plaintiff was agitated, and his speech was normal

but loud and at times overproductive.  [R. 1022.]  Dr. Bien-Aime further observed that Plaintiff's

mood was angry, his affect was intense and restricted at time, and his concentration was limited.

[*Id.*]  Dr. Bien-Aime also noted that Plaintiff did not have any disorder of thought, he was not

suicidal, he was not homicidal, and he denied any hallucinations.  [*Id.*]

Plaintiff had an appointment with Ms. Hunter on January 18, 2017.  [R. 1025.]  Ms.

Hunter observed that Plaintiff was alert and oriented, his attire and hygiene were appropriate,

and he denied suicidal and homicidal ideations.  [*Id.*]  During the appointment, Ms. Hunter

discussed Plaintiff's frustration and displeasure with having multiple providers and conflicting

appointments.  [*Id.*]  At his next appointment with Ms. Hunter, on January 23, 2017, Plaintiff

was more pleasant because he was no longer required to honor multiple appointments at various

programs.  [R. 1027.]  Nonetheless, Plaintiff missed appointments on January 30, 2017 and

February 6, 2017, as well as a group session on February 9, 2017.  [R. 1028-29.]

On February 13, 2017, Plaintiff had an appointment with Dr. Bien-Aime.  [R. 1030.]  Dr.

Bien-Aime noted that Plaintiff indicated that he was feeling calmer, sleeping much better, denied

outburst of anger, and denied difficulty concentrating.  [*Id.*]  Plaintiff also denied any flashbacks

to being raped by his brother, he denied auditory hallucinations, and Dr. Bien-Aime observed

that no delusions were elicited.  [*Id.*]  Dr. Bien-Aime further observed that Plaintiff seemed

much calmer, his speech was normal in tone and volume, he did not have any disorder in his

thought process, his mood was normal, and his affect was full range.  [*Id.*]  Dr. Bien-Aime noted

that although Plaintiff denied difficulty concentrating, his concentration was nonetheless limited.

[*Id.*]

On February 27, 2017, Plaintiff had an appointment with Ms. Hunter.  [R. 1033.]  Ms.

Hunter noted that Plaintiff's clinical discharge goal was for Plaintiff to demonstrate a more

consistent pattern of attendance, report less anxiety, and enable Plaintiff to be transferred to a

lower level of care for medical management only.  [R. 1034.]  In terms of Plaintiff's strengths-

based clinical formulation, Ms. Hunter noted that Plaintiff reported doing repairs in his mother's

home, and that he assists many people in his community.  [R. 1033.]  Ms. Hunter further noted

that Plaintiff was involved in his church community and that he was taking Bible classes.  [R.

1034.]

On April 12, 2017, Plaintiff had another appointment with Dr. Bien-Aime.  [R. 1046.]

Dr. Bien-Aime noted that Plaintiff reported feeling all right, sleeping "so so", and feeling

frustrated.  [*Id.*]  Plaintiff further reported having some difficulty concentrating, and having flashbacks.  [*Id.*]  Dr. Bien-Aime observed that Plaintiff seemed calmer, his speech was normal in tone and volume, his mood was normal, and his affect was full range.  [*Id.*]  Dr. Bien-Aime further noted that Plaintiff was not suicidal or homicidal, his concentration was limited, he denied auditory hallucinations, and no delusions were elicited.  [*Id.*]  Following this appointment, Plaintiff missed appointments on April 20, 2017, May 3, 2017, May 10, 2017, May 22, 2017, and June 1, 2017.  [R. 1047, 1049, 1050, 1051.]

On June 23, 2017, Plaintiff managed to attend his appointment with Dr. Bien-Aime.  [R. 1052.]  Dr. Bien-Aime noted that Plaintiff reported feeling angry and irritable, and that he had been having difficulty sleeping.  [*Id.*]  Dr. Bien-Aime further noted that Plaintiff reported outbursts of anger and continued to complain of concentrating.  [*Id.*]  Dr. Bien-Aime observed that Plaintiff seemed restless, talkative, his mood was irritable, anxious, and his affect was restricted.  [*Id.*]  Dr. Bien-Aime noted that Plaintiff was not suicidal or homicidal, his concentration was limited, he denied auditory hallucinations, and no delusions were elicited. [*Id.*]  Plaintiff continued to have appointments throughout 2017 and 2018. [R. 1053-59.]

On February 13, 2018, Plaintiff had an appointment with Ms. Hunter.  [R. 1057.]  Ms. Hunter observed that Plaintiff was alert and oriented, appropriately attired, and his "verbal presentation was of his usual manner."  [*Id.*]  Plaintiff denied suicidal and homicidal ideations. [*Id.*]  Ms. Hunter also noted that Plaintiff stated that he had missed sessions because he was arrested for punching a man in the face.  [*Id.*]

On November 7, 2018, Plaintiff had an appointment with Adam Turkel, LCSW.  [R. 1061.]  Mr. Turkel noted that Plaintiff's primary diagnosis was bipolar disorder and

24

post-traumatic stress disorder.  [*Id.*]  Mr. Turkel observed that Plaintiff was alert and oriented,

his mood was appropriate, and his speech volume was high but its rate was normal.  [*Id.*]  Mr.

Turkel further observed that Plaintiff walked with a cane.  [*Id.*]  Plaintiff also reported that he

had an increase in anxiety.  [R. 1062.]

On November 27, 2018, Plaintiff had another appointment with Mr. Turkel.  [R. 1069.]

Mr. Turkel observed that Plaintiff was alert and oriented, his speech rate was normal but he

spoke loudly, and he appeared worried.  [*Id.*]  Mr. Turkel noted that Plaintiff reported an increase

in depressive symptoms and stress, as well as a decrease in appetite, and that he was not sleeping

well.  [R. 1070.]  Plaintiff further reported that he needed help managing his symptoms, and that

he wanted to be in an intensive setting.  [*Id.*]  Plaintiff denied hearing voices or using substances,

and reported that his last hospitalization was years ago.  [*Id.*]

On December 3, 2018, Plaintiff had an appointment with David Tzali, Psy. D.  [R. 1078.]

Dr. Tzali observed that Plaintiff was oriented to time, person, and place, and he presented with a

euthymic mood and congruent affect.  [*Id.*]  Plaintiff denied current hallucinations, delusions,

and suicidal and homicidal ideations.  [*Id.*]  Dr. Tzali noted that Plaintiff was transferred because

Plaintiff felt he needed a higher level of care and rated his risk level as moderated.  [R. 1079.]

### 2.    Medical Evidence from December 4, 2018 Onward

On December 4, 2018, Plaintiff had an appointment with Jonathan Kirsten, M.D.  [R.

1080.]  Dr. Kirsten noted that Plaintiff's primary diagnosis antisocial personality disorder,

unspecified mood disorder, and a secondary diagnosis of cocaine and cannabis use disorders in

full sustained remission.  [*Id.*]  Dr. Kirsten further noted that Plaintiff's current symptoms

included impulsivity, mood lability, poor sleep, and verbal outburst.  [*Id.*]  Dr. Kirsten observed

that Plaintiff walked with a cane, his speech was sometimes loud and dramatic, his mood was

upset, and his affect was labile.  [R. 1082.]

On May 1, 2019, Plaintiff had an appointment with Rada Norov, M.D. [R. 826.] Dr.

Norov observed that a diabetic foot exam was remarkable "for some calluses sensation is intact."

[*Id.*]  Dr. Norovo also noted that Plaintiff ambulates with a cane. [*Id.*]  Dr. Norov further

observed that Plaintiff's mood and affect were normal, and his judgment and thought content

were normal. [R. 829.] On June 18, 2019, Plaintiff had a sick visit with Arlene Perkins, M.D. [R.

834.] Dr. Perkins observed that Plaintiff ambulated with a cane and that he complained of foot

pain. [*Id.*]

On July 3, 2019, Plaintiff had another appointment with Dr. Norov. [R. 840.] Dr. Norov

noted that Plaintiff ambulated with a cane and that Plaintiff still had gait instability. [*Id.*] Dr.

Norov also noted that Plaintiff's foot pain had improved. [*Id.*]  In reviewing Plaintiff's different

systems, Dr. Norov noted that Plaintiff's musculoskeletal system was positive for

arthralgia/myalgia, joint swelling, and pain. [R. 842.] Dr. Norov also observed that Plaintiff

reported a burning pain on the bottom of his feet. [R. 843.]  On July 8, 2019, Plaintiff had

another follow-up appointment with Dr. Norov.  [R. 848.]  Dr. Norov again noted that Plaintiff

ambulated with a cane.  [*Id.*]  Dr. Norov also noted that Plaintiff was positive for back pain. [R.

851.]

On September 10, 2019, Plaintiff had another appointment with Dr. Norov.  [R. 856.]  Dr.

Norov noted that Plaintiff had gait instability and was at the appointment post-hospitalization for

fall with head trauma.  [*Id.*]  Dr. Norov further noted that Plaintiff "did not have his cane and had

a mechanical fall."  [*Id.*]  Dr. Norov also noted that Plaintiff was positive for arthralgia/myalgia

and back pain.  [R. 858.]  Dr. Norov further observed that Plaintiff's mood and affect were

normal, and his judgment and thought content were normal.  [R. 859.]

On October 15, 2019, Plaintiff had another appointment with Dr. Norov.  [R. 868.]  Dr.

Norov noted that Plaintiff walked with a cane and had multiple hospitalizations from falls in the

last year.  [*Id.*]  Dr. Norov further stated that Plaintiff reported some numbness on the plantar

surfaces of his feet.  [*Id.*]  Dr. Norov also noted that Plaintiff was positive for pain and stiffness.

[R. 870.]  Finally, Dr. Norov observed that Plaintiff's mood and affect were normal, and his

judgment and thought content were normal.  [R. 871.]

On November 26, 2019, Plaintiff had an appointment with Dr. Norov.  [R. 876.]  Dr.

Norov noted that the reason for Plaintiff's appointment was because he was in pain while

walking, and further noted that Plaintiff was developing large plantar wart that had become

inflamed.  [*Id.*]  Dr. Norov stated that Plaintiff's pain kept him from walking for the last two

days.  [*Id.*]  Dr. Norov also observed that Plaintiff's mood and affect were normal, and his

judgment and thought content were normal.  [R. 879.]  On January 29, 2020, Plaintiff had

another appointment with Dr. Norov.  [R. 888.]  Dr. Norov noted that Plaintiff was presenting

with foot pain.  [*Id.*]  Dr. Norov also observed that Plaintiff's mood and affect were normal, and

his judgment and thought content were normal.  [R. 891.]

On February 24, 2020, Plaintiff went to Kings County Hospital Center and met with Gali

Hashmonay, M.D.  [R. 1084.]  Dr. Hashmonay noted that Plaintiff reported that he was

depressed, and that he had not been taking any of his psych medications for approximately a

year.  [*Id.*]  Dr. Hashmonay reported that Plaintiff stated that he did not want to get up in the

morning, he had been experiencing a decreased appetite, and he was isolating himself.  [*Id.*]

27

Plaintiff also stated that he was experiencing flashbacks.  [*Id.*]  Plaintiff was discharged on June 12, 2020 because Plaintiff was not responsive to outreach efforts.  [*Id.*]

On March 16, 2020, Plaintiff had an appointment with Dr. Norov.  [R. 896.]  Dr. Norov noted that Plaintiff's foot infection was resolved, but Plaintiff needed further podiatry intervention for removal of calluses and toe nail clipping.  [*Id.*]  In terms of his musculoskeletal system, Dr. Norov noted that Plaintiff was positive for dizziness and numbness.  [R. 899.]

## C.    Plaintiff's Hearing Testimony

Plaintiff was born on October 9, 1961 and at the time of the hearing he was 58 years old. [R. 590.]  He had been living in a shelter for the past two years.  [R. 599.]  In the shelter, Plaintiff met with case workers three times a week.  [R. 600.]  Plaintiff testified that the case workers would make sure that Plaintiff obtained his medication and took his medication.  [*Id.*] Plaintiff also testified that they provided food at the shelter, but that because he could not eat everything his younger brother would take him grocery shopping about twice a month.  [R. 602.] Plaintiff further testified that his counselor would assist him with his laundry.  [*Id.*]  In terms of his interests, Plaintiff testified that he likes to read and watch television and that is how he spends most of his days.  [R. 604.]

With respect to public transportation, Plaintiff testified that he uses public transportation but that if he is traveling to someplace unfamiliar, he would have someone come with him.  [R. 603.]  Plaintiff testified that he feels like people stare at him on public transportation and that he will get off the train if he feels that it could become a physical altercation.  [*Id.*]  Plaintiff testified that he occasionally got into physical altercations, like his arrest in 2018, if he felt threatened.  [R. 609.]  In terms of his interactions with the public, Plaintiff testified that if he is

28

in a crowd, he feels like people are talking about him and that he has "got to get away." [*Id.*]

Plaintiff testified that he had been hospitalized due to his falls. [*Id.*] Plaintiff also testified that in 2019 he was hospitalized overnight for passing out in the street. [R. 605.] When discussing this hospitalization, Plaintiff began to cry before he composed himself and continued with his testimony. [R. 606.] Plaintiff also testified that he had been hospitalized for seven months at some point prior to 2012. [R. 604-05.]

Plaintiff testified that he was prescribed the use of a cane by his primary care physician and that he had his cane for two years. [R. 606, 607.] Plaintiff stated that he always uses his cane. [R. 608.] He further testified that he was prescribed the cane because it hurts for him to step on his left foot. [R. 607.] Plaintiff stated that his left foot hurt because he had calluses that had become sores, and that even after he had surgery to remove them, the calluses returned. [*Id.*] Plaintiff also testified that he was receiving treatment and medication for diabetes. [*Id.*]

With respect to mental limitations, Plaintiff testified that he had trouble concentrating and focusing. [R. 610.] Plaintiff further testified that there are time when he gets emotional and starts crying. [*Id.*] With respect to physical limitations, Plaintiff testified that he could not stand for an eight hour work day, even if he had coffee breaks. [R. 610-11.]

Plaintiff testified that his medications make him sleepy. [R. 611-12.] Plaintiff testified that he had not used any illegal drugs since 2012. [R. 613.] Plaintiff testified that he takes care of his mother. [R. 612.] He gets her flowers, they sit and watch TV together, and he takes out the garbage for her. [R. 612-13.]

D.    **Vocational Expert Hearing Testimony**

Vocational expert Helen Feldman testified that there would be jobs for an individual with

Plaintiff's age, education and no past relevant work, with no exertional limitations, but the individual is limited to performing simple, routine, and repetitive tasks not at a production rate pace, and the individual would only be able to perform simple work-related decisions and only have occasional interactions with supervisors, coworkers, and the public. [R. 614-15.] Ms. Feldman testified that at the medium exertion, such an individual could be a Box Bender or a Production Helper, and at the light exertion such an individual could be a Garment Bagger. [R. 615.] Ms. Feldman further testified that such an individual would be allowed to be off task for no more than five percent of their time in addition to regularly scheduled breaks. [R. 616.] Ms. Feldman noted that if a person had a cane, medium exertion jobs would be limited. [*Id.*]

E.     **The ALJ's Decision**

At the first step of the sequential analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the date of his application. [R. 566.] At the second step, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, obesity, post-traumatic stress disorder, and bipolar disorder. [R. 567.] At the third step, the ALJ found that prior to December 4, 2018 Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in the Adult Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. [*Id.*]

At step four, the ALJ concluded that prior to December 4, 2018, Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 416.967(c) except:

> perform simple, routine and repetitive tasks, but not at production rate pace; make simple work-related decisions; occasionally interact with supervisors and co-workers; and never interact with the public.

30

[R. 569.]  To reach this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence " in accordance with 20 C.F.R. § 416.929 and Social Security Ruling 16-3p. [R. 570.]

At step five, in light of the vocational expert's testimony, the ALJ determined that prior to December 4, 2018, Plaintiff could be a Box Bender (DOT code: 641.687-010), or a Production Helper (DOT code: 529.686-010).  [R. 576.]  The ALJ thus concluded Plaintiff was "not disabled" as defined in the SSA prior to December 4, 2018, but became disabled on that date and has continued to be disabled through the date of the ALJ's decision.  [*Id.*]

## III.   LEGAL STANDARDS

### A.   Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is even more deferential than the "clearly erroneous" standard.  *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012).  "Even where the administrative record may also adequately support contrary findings on particular issues, the

ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam). "The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotations omitted).

"Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B.    Statutory Disability**

The SSA defines the term "disability to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if

his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

Social Security Regulations set forth a five-step sequential analysis for evaluating whether a person is disabled under the SSA:

(1) whether the claimant is currently engaged in substantial gainful activity;
(2) whether the claimant has a severe impairment or combination of impairments;
(3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments;
(4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and
(5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v)).  The claimant bears the burden of proof for the first four steps of the process.  *See Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008).  If the claimant proves that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner at the fifth and final step.  *See Brault*, 683 F.3d at 445.

## IV.  DISCUSSION

### A.    The ALJ Failed to Apply the Treating Physician Rule[9]

---

[9] On January 18, 2017, the Commissioner published the "Revisions to Rules Regarding the Evaluation of Medical Evidence," effective March 27, 2017.  82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 17, 2017). The Revisions altered certain longstanding rules for evaluating medical opinion evidence for cases filed after March 27, 2017. *Id*. at *5844. "Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight." *Prieto v. Comm'r Soc. Sec.*, 2021 WL 3475625, at *8 (S.D.N.Y. Aug. 6, 2021). However, because the present application was filed prior to March 27, 2017, the treating

Plaintiff first argues that the ALJ failed to apply the treating physician rule when the ALJ gave little weight to Nurse Lapin's opinion, Dr. Liu's opinion, and Dr. Broderick's opinion. [Dkt. 21 at 22-31.] The Acting Commissioner replies that Nurse Lapin was not a treating source, and the ALJ appropriately weighed his opinion.  [Dkt. 24 at 17-18.] The Acting Commissioner further argues that the ALJ was not required to give controlling weight to Dr. Liu's opinion for the reasons provided by the ALJ.  [Dkt. 24 at 12-15.] Finally, the Acting Commissioner argues that the ALJ gave Dr. Broderick's opinion some weight because it was not supported by the record.  [*Id.* at 16-17.]

The treating physician rule provides that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). In order to override the opinion of the treating physician, "the ALJ must explicitly consider, *inter alia*: (1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  *Id.*  An ALJ's failure to explicitly apply these factors is a procedural error. *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019).  If the ALJ has procedurally erred, but the record otherwise provides "good reasons for its weight assignment", then the error is harmless, but if the record does not provide these good reasons, the Court will "remand for the ALJ to comprehensively set forth its reasons." *Id.* (internal quotations and alterations omitted).

### 1.    Nurse Lapin's Opinion

---

physician rule still applies in the present case.

The ALJ gave limited weight to Nurse Lapin's medical source statement.  [R. 571.]  The ALJ stated that Nurse Lapin's opinion was not entirely supported by the treatment notes, which showed that Plaintiff had essentially normal physical examinations.  [*Id.*]  Although Plaintiff seems to argue that Nurse Lapin's findings should be given treating physician deference, because Nurse Lapin is a nurse practitioner, his opinion is not entitled to treating physician deference.  *See* 20 C.F.R. § 416.913(d)(1); *see also Genier v. Astrue*, 290 F. App'x 105, 108 (2d Cir. 2008).  Setting aside any argument that Nurse Lapin's opinion is entitled to deference, the ALJ's weighing of Nurse Lapin's findings is supported by the record.  On February 27, 2013, Dr. Thukral made the observation that Plaintiff had a normal gait, could walk on his heels and toes without difficulty, used no assistive devices, and needed no help changing for the exam or getting on or off the exam table.  [R. 349.]  In and around March 6, 2013, Dr. Cadet found that Plaintiff had no physical limitations for performing his work.  [R. 289-90.]  On March 7, 2013, Dr. Kranjac made similar determinations with respect to Plaintiff's work limitations. [R. 305-06.]  Accordingly, the ALJ did not err in the weight she prescribed to Nurse Lapin's decision.

## 2.    Dr. Liu's Opinion

The ALJ gave Dr. Liu's November 16, 2012 opinion little weight. [R. 571.][10]  More specifically, the ALJ gave little weight to Dr. Liu's opinion that Plaintiff's psychiatric symptoms prevented Plaintiff from sustaining employment.  [*Id.*]  The ALJ stated that Dr. Liu's opinion of Plaintiff's non-exertional limitations are "vague as to the extent of the claimant's impairments impacted those non-exertional limitations."  [*Id.*]  The ALJ further stated that the record "supports mild to moderate limitations" which the ALJ included in the RFC, but that certain

---

[10] The ALJ considered Dr. Liu's opinions from November 16, 2012 and January 24, 2012. [R. 571.] Because the opinions are identical, the Court will treat it as one opinion.

"mental status examinations did not show extreme results and the record did not show that [Plaintiff] was hospitalized for his mental impairments around or after the application date." [*Id.*]  The ALJ also stated that Dr. Liu's opinion was conclusory and that Dr. Liu made disability determinations which are reserved for the Commissioner.  [*Id.*]

In evaluating Dr. Liu's opinion, the ALJ failed to consider all of the necessary factors. The ALJ did not consider the frequently, length, nature, and extent of Dr. Liu's treatment, the amount of medical evidence supporting the opinion, or whether Dr. Liu is a specialist.  [*See* R. 571.]  The ALJ, however, did consider the consistency of the opinion with the remaining medical evidence, and found that Dr. Liu's opinion was not supported by the record.  [*Id.*]  However, this is insufficient to allow the ALJ to disregard the treating physician rule as the ALJ also failed to provide good reasons.

The ALJ disregarded Dr. Liu's opinion because it was vague, but this does not constitute a good reason to limit the weight to Dr. Liu's opinion.  Instead, if the ALJ indeed found Dr. Liu's opinion vague, then that would place upon the ALJ a "duty to recontact a treating physician for clarification if the treating physician's opinion is unclear."  *Lee v. Saul*, 2020 WL 5362619, at *14-15 (S.D.N.Y. Sept. 8, 2020).  Nonetheless, the ALJ failed to recontact Dr. Liu for further clarification on the vague portion of her opinion.  Further, the ALJ's statement that certain mental status reports cited by the ALJ did not support Dr. Liu's extreme conclusions is also not a good reason.  The mental status examinations the ALJ references includes the Plaintiff's case manager, Kerron Prendergast's March 25, 2013 opinion [R. 303-04], an April 13, 2011 update to Plaintiff's file from Central New York Psychiatric Center [R. 321-22 *repeated at* R. 448-49], Dr. Liu's opinion [R. 331-32, 335 *repeated at* R. 458-62], Plaintiff's treatment notes

from Central New York Psychiatric Center [R. 387-436], and notes from Plaintiff's appointments at Kings County Hospital [R. 935-1076].  However, the ALJ fails to identify what specifically within these mental status examinations conflicts with Dr. Liu's "extreme" findings that merits overriding the treating physician rule.  *See Cirelli v. Comm'r Soc. Sec.*, 2020 WL 3405707, at *11-12 (S.D.N.Y. May 7, 2020) ("[T]he ALJ does not identify what normal findings or denial of symptoms he finds significant in the treatment notes identified.").  The ALJ's conclusory statement that these mental status examinations "generally did not show extreme results" is insufficient to establish good reason to not give deference to Dr. Liu's opinion. *See Mercado v. Colvin*, 2016 WL 3866587, at *16 (S.D.N.Y. July 13, 2016) (finding that conclusory assertions will not suffice to disregard a treating physician's opinion).  To the extent that the ALJ stated that Dr. Liu's opinion made disability determinations reserved for the Commissioner, the ALJ is indeed correct, a "treating physician's statement that the claimant is disabled cannot itself be determinative."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(e)(1)).  Nonetheless, "[r]eserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited."  *Id.* at 134.  Accordingly, because the ALJ failed to provide good reasons for disregarding Dr. Liu's opinion, I conclude that the ALJ failed to comply with the treating physician rule.

### 2.    Dr. Broderick's Opinion

Plaintiff also argues that the ALJ erred in not giving controlling or great weight to Dr. Broderick's opinion. The ALJ gave Dr. Broderick's September 2, 2014 opinion some weight.

[R. 572.]  The ALJ stated that Dr. Broderick's identification of Plaintiff having "marked" limitations and Dr. Broderick's statement that Plaintiff had frequent periods of decompensation were not supported by the record.  [*Id.*]  The ALJ further stated that while moderate non-exertional limitations were supported by the record, the marked and extreme limitations were not.  [*Id.*]  The ALJ also stated that the record did not support Dr. Broderick's opinion that Plaintiff would need to miss multiple days of work per month.  [*Id.*]  The ALJ also again observed that there was no evidence of hospitalizations, and further observed that Plaintiff was not in a highly structured program.  [*Id.*]

In evaluating Dr. Broderick's opinion, the ALJ again failed to consider all of the necessary factors in accordance with the treating physician rule.  The ALJ did not consider the frequently, length, nature, and extent of Dr. Broderick's treatment, the amount of medical evidence supporting the opinion, or whether Dr. Broderick is a specialist.  [*See* R. 572.]  The ALJ, however, did seem to consider the consistency of the opinion with the remaining medical evidence, and found that parts of Dr. Broderick's opinion was not supported by the record.  [*Id.*] Nonetheless, this is not sufficient to displace the treating physician rule as the ALJ failed to provide good reasons.  The ALJ limited the weight accorded to Dr. Broderick's because the record did not support Dr. Broderick's finding that Plaintiff would have marked and extreme limitations in certain areas. Similar to the ALJ's statements regarding Dr. Liu's opinion, such conclusory statements are insufficient to limit the weight prescribed to a treating physician's opinion. *See Mercado*, 2016 WL 3866587, at *16; *see also Cintron v. Berryhill*, 2018 WL 1229731, at *8 (S.D.N.Y. Mar. 6, 2018) (holding that mere reference to the record without a citation was insufficient to constitute good reason).  The ALJ again refers to the same mental

status examinations and summarily asserts that they "do not demonstrate that level of loss." [R. 572.]  But akin to the ALJ's findings with respect to Dr. Liu's opinion, the ALJ fails to identify what specifically within these mental status examinations conflicts with Dr. Broderick's opinion. *See Cirelli*, 2020 WL 3405707, at *11-12.  Because the ALJ failed to provide good reasons for disregarding the ALJ's opinion, I conclude that the ALJ failed to comply with the treating physician rule.

The ALJ's failure to apply the treating physician rule with respect to Dr. Liu and Dr. Broderick's opinions is not a harmless error.  Indeed, the proper application of the treating physician rule is potentially dispositive in determining whether Plaintiff was disabled before December 4, 2018 within the meaning of the Act.  If credited, Dr. Liu's opinion that Plaintiff had limitations in his ability to understand instructions, retained information, and stay focused for any length of time, would be dispositive as Ms. Feldman testified that there were no jobs available for an individual who was off task for more than five percent of the time.  [R. 436.] Similarly, Dr. Broderick's opinion noted that Plaintiff had marked limitations in maintaining attention and concentration for extended periods, which would also be dispositive in light of Ms. Feldman's testimony.  *See Newell v. Saul*, 2021 WL 608991, at *21 (S.D.N.Y. Feb. 17, 2021) (finding that an ALJ's improper application of the treating physician rule was not harmless error in light of the vocational expert's testimony that the plaintiff would be unable to work and collecting cases).  Accordingly, I conclude that the ALJ's failure to apply the treating physician rule with respect to Dr. Liu and Dr. Broderick's opinions was not a harmless error, and that "remand for the ALJ to comprehensively set forth its reasons" is appropriate.  *Estrella*, 925 F.3d at 96.

**B.    The ALJ's Listing and RFC Must Be Reconsidered in Light of the ALJ's Error in Applying the Treating Physician Rule**

Because the ALJ failed to comply with the treating physician rule, the Court need not decide whether substantial evidence supports the ALJ's finding that Plaintiff did not meet the requirements for Listing 12.04 or Listing 12.15. *Newell*, 2021 WL 608991, at *21 ("Because the ALJ violated the treating physician rule, the Court need not decide whether substantial evidence supports the ALJ's finding that Newell does not meet a listing requirement under Step Three.").

Further, because the ALJ failed to apply the treating physician rule, the ALJ's RFC determination cannot be found to have been supported by substantial evidence. *See Mack v. Comm'r Soc. Sec.*, 2021 WL 3684081, at *18 (S.D.N.Y. July 26, 2021) ("Because, for the reasons set forth above, the ALJ failed to apply the Treating Physician Rule, her RFC determination is necessarily flawed and cannot be found to have been supported by substantial evidence.")[11]  Accordingly, on remand, the ALJ will have to reconsider Plaintiff's RFC "in light of the weight granted to the opinions of [his] treating physicians following the proper application of the Treating Physician Rule." *Id.*

**C.    Remand for Further Proceedings**

Plaintiff moves the Court to reverse the ALJ's decision and award benefits.  [Dkt. 21 at 39.]  Presumably, Plaintiff is seeking a calculation-only remand.  "However, a calculation-only remand is appropriate when the record provides persuasive evidence that renders any further

---

[11] To the extent that Plaintiff argues that the ALJ failed to consider the side effects of his medication in the RFC, the ALJ indeed included an analysis of Plaintiff's medications in the RFC, and specifically found that they "appear to have been effective and with few adverse side effects."  [R. 574.]  Nonetheless, on remand, the ALJ again should be sure to consider the adverse side effects of Plaintiff's medications in the RFC.  *See Mack*, 2021 WL 3684081, at *18 (finding that a failure to expressly consider a plaintiff's side effects of her medications in the RFC determination was an error).

40

proceedings pointless." *Newell*, 2021 WL 608991, at *23 (internal quotations and alterations omitted). Based on the circumstances here, I cannot conclude that there is persuasive evidence that indicates that Plaintiff is disabled. Thus, this case should be remanded for further proceedings.

## V.  CONCLUSION

For the reasons set forth above, the Acting Commissioner's motion for judgment on the pleadings is **DENIED** and Plaintiff's motion is **GRANTED** to the extent that this case should be remanded to the Acting Commissioner for further proceedings consistent with this Decision and Order.

Dated: June 30, 2022
           White Plains, New York

Respectfully Submitted,

_____
Paul E. Davison, U.S.M.J.

41